**Gertrude P. Cronch, Administratrix, Appellee, v. The Peoria, Lincoln & Springfield Traction Company and the Illinois Traction Company, Appellants.**

1. RAILROADS—*crossing accidents.* Plaintiff's intestate was killed when a wagon on which he was riding was struck by defendant's electric car. The wagon loaded with iron was stopped just before reaching the tracks at the place of the accident, which was not a public crossing, so that the iron could be readjusted. Plaintiff's intestate stood on the load to hold it in place and was looking down at it when the driver started across the tracks. He knew the place to be dangerous and had warned his men to be careful. The iron on the wagon was making a loud noise and he knew he could not well get off the right of way if a car came, since the gate on the opposite side of the track was closed. *Held,* that intestate was not shown to have exercised due care.

2. NEGLIGENCE—*burden of proof.* In an action for wrongful death of one killed when a wagon on which he was riding was struck by an electric car of defendant, it must be alleged and proved that deceased was, at the time of the accident, in the exercise of due care.

Appeal from the Circuit Court of Logan county; the HON. THOMAS M. HARRIS, Judge, presiding. Heard in this court at the October term, 1912. Reversed with finding of fact. Opinion filed April 18, 1913. Rehearing denied May 16, 1913.

KING & MILLER, for appellants.

HUMPHREY & ANDERSON and BEACH & TRAPP, for appellee.

MR. JUSTICE CREIGHTON delivered the opinion of the court.

This was an action on the case brought by appellee, as administratrix of the estate of Dellon Cronch, deceased, against the appellant companies, to recover damages for the death of said Cronch, which was alleged to have been caused by the negligence of the appellants.

A hearing before the court and a jury resulted in a verdict for the appellee in the sum of $10,000, upon which judgment was rendered by the court, after overruling a motion for a new trial. This is an appeal from that judgment.

The declaration alleged, in substance, that the appellants owned a certain electric railroad and operated cars thereon, and that the appellant companies, on the day of this accident, negligently drove, handled and operated a certain electric car at the time in question; that the appellants drove the car at a reckless and dangerous rate of speed without having the car under control as it approached the crossing where the accident occurred, and without keeping a careful lookout ahead to see if any person engaged in unloading freight in a certain car on the siding at said crossing, were about to cross said crossing; and without giving any warning by bell or whistle or other signal of the approach of the car; that by reason of the negligence of said appellants, appellee's intestate was, while in the exercise of due and ordinary care for his own safety, and while driving over said crossing, hit by said car and injured, and from which such injury died, etc.

To the declaration each of the appellants filed a plea of the general issue, and the appellant Illinois Traction Co., also filed a special plea in bar, denying the ownership and operation of the said railroad.

The substantial facts to be gathered from a careful review of this record are, that on the 29th day of May, 1911, appellee's intestate and other men in the employ

of the Decatur Bridge Company, were working at a place called Wilmert siding, on the line of the Illinois Traction System. Appellee's intestate was in charge of the men, and they were engaged in unloading a car of bridge iron from a car which had been set out on the side track, and said iron was to be conveyed to some point away from the line of the road for the purpose of building a bridge. The car of iron had been shipped over the Illinois Traction System and set out on this side track, and on the day in question appellee's intestate and the other men had arrived and, having procured two teams and wagons, proceeded to remove the iron from the car. The place where the accident occurred was at a crossing over the main track of the railroad, but it was not an open public crossing and was not in a village or city. There was a private road to the public highway going east from the track, which was used by persons having business to transact with the railroad company there, but there was a gate which was on the east side of the right of way which had to be opened and passed through, before one could go from the right of way to the public highway. There was no way to get to the side track except through this lane from the east side, and there was no highway or road on the west side of the right of way. The railroad, at this point, runs north and south. The switch track was on the west side of the main track. Between the main track and the side track the poles of the company were located, carrying thereon the power wires, signal wires, cross arms, etc. These poles were seventy or eighty feet apart.

Appellee's intestate and his men, with the two teams and wagons, started in the work of removing the bridge iron from the car, and, while they were working, on the morning of the day of the accident, he warned the men to be careful and look out for the cars. Two loads of the iron were removed in the forenoon,

and, at about 2:15 in the afternoon, the men, having loaded one wagon and it being driven to one side, started to load the wagon driven by a Mr. Martin. This wagon was backed up, on the switch track paralleling the same, so that the wagon could be loaded from the end of the car, then the team was hitched on to it, when loaded, and it was driven along the switch track, bumping along on the ends of the ties, until it reached a point near where it was desired to cross, and then turned out and came up to the main track at right angles. Just before reaching the main track it was discovered that the iron was slipping off of the wagon, and then appellee's intestate called to the man working with him to push the iron up on the wagon and then get on and hold the iron down until they could get it across the main track. When the iron was placed back on the wagon, appellee's intestate, a Mr. Smith and the driver, Mr. Martin, got on the wagon and stood on the iron and held it in place with their feet. At this time the gate on the east side of the right of way, through which they would have to pass, was not open. The men stood on the iron, holding it in place by their weight, and were looking down to watch the iron. Mr. Martin, the driver, was standing about over the front axles of the wagon, with appellee's intestate just behind him, with his hands on Mr. Martin's shoulders, and Mr. Smith stood behind him with his hands on the shoulders of appellee's intestate. At about the time the team pulling the wagon had cleared the main track and while the wagon was yet across the main track, a car from the south struck the wagon about the middle, and appellee's intestate and Mr. Martin were killed and Mr. Smith injured.

The evidence of Mr. Malerich, one of the men working under appellee's intestate, shows that after the wagon here spoken of had been loaded, Mr. Malerich, Mr. Smith and appellee's intestate, remained in the car until the iron began to slip off the wagon, then they

all went out, Mr. Malerich at the east door of the car, and he says that he then looked south and saw no car approaching, and that this was from two to four minutes before the wagon was struck. After the wagon was righted, he says, he started to go across the main track to put some cots on the wagon, and that he then heard the trolley wires buzzing, stopped, looked around, saw a car about 300 feet away, coming at a speed of from 50 to 60 miles per hour, and hollered to the other men on the wagon, but the car came so fast they did not hear him.

Several witnesses testified that they heard no warning given of the approach of the car, while others, including the motorman and the conductor of the car, together with several passengers on the car, said that they heard some signal given, and the motorman testified that he sounded the danger signal just as he first saw the horses, and also that when 750 or 800 feet south of the siding he gave a siding whistle as a signal to the conductor to know whether or not to stop at the siding, and that the conductor signaled him not to stop.

It is probably true that the danger signal was not sounded until the horses were sighted by the motorman. Not being a public crossing there could be no reason for a signal until the motorman should discover some reason for giving it. The car was, at the time, going at a rate of from 45 to 50 miles per hour, and the motorman testified that as he gave the signal he threw on the emergency brake, but the momentum of the car was too great to cause much loss of speed before the wagon was struck.

When the wagon was struck by the car, appellee's intestate was riding in the wagon, standing up, but he was not looking for any car that might be coming, but was looking down watching the iron. He knew this to be a dangerous place, and warned his men, only that morning, to be careful in crossing and watch for cars

before crossing. He knew he could not well get off the right of way if a car should come, as the gate on the east of the road was closed.

It is clear from the evidence that if the men on the wagon had used care, before going on the main track, they would have seen and heard the approach of the car. The iron upon the wagon was making a noise, and these parties knew cars were likely to pass there at any time. The fact the iron on the wagon was making a noise made it more important than ever that they should take some precaution for their own safety before driving upon the main track, as the noise of the rattling iron might, or could, drown the sound of an approaching car. While the law does not require that every person who is about to go across a railroad track shall first stop, look and listen, yet, "A failure to look or listen, especially when it appears affirmatively that looking or listening might have enabled the party injured to see the approaching train and thus avoid the injury, is evidence tending to show negligence." *Chicago, R. I. & P. Ry. Co.* v. *Jones*, 135 Ill. App. 380.

That the crossing at the point was not a public crossing, and that this siding was not a regular stopping place for all cars on the line, was known to appellee's intestate. And, even if it was the duty of the appellant to stop at this point, or to give the usual public crossing signals, this did not relieve appellee's intestate from the duty of using due care for his own safety. In the case of *Schlauder* v. *Chicago & Southern Traction Co.* 253 Ill. 154, the court, in discussing this question, said: "The presumption (that every person will perform a duty imposed by law) does not absolve one from exercising such care and prudence as a reasonably prudent person would under the same circumstances."

It was a material allegation in the appellee's declaration that the deceased was, at the time of the accident, in the exercise of due and reasonable care for his

own safety. And it was also necessary, in order that a recovery might be had, that this allegation should be proven by the evidence. We are of the opinion the evidence fails to establish and support this allegation of the declaration.

For the reason herein stated, the judgment will be reversed.

*Reversed with finding of fact.*

Finding of fact: We find, as a fact that at the time of the injury to appellee's intestate, he was not in the exercise of due care for his own safety.