## Simon J. Campbell, Appellee, v. Chicago City Railway Company, Appellant.

### Gen. No. 23,730.

1. ROADS AND BRIDGES, § 231*—*when drivers approaching intersection may not each assume other will give way to avoid collision.* Where two persons are driving on lines that visibly intersect, the general obligation of ordinary care becomes for each a definite duty, and if, as they approach, their contiguity and mutual movements suggest a probable or even possible collision, neither is entitled to act on the assumption that the other will give way.

2. STREET RAILROADS, § 131*—*when evidence does not support verdict for plaintiff for injury due to collision of street car with vehicle.* Where the weight of the evidence shows that plaintiff, while driving a vehicle in a southerly direction upon a street, suddenly swerved his horse to the east directly in the path of an approaching northbound street car, which was then so close that the head of the horse came in contact with the car, a verdict for plaintiff will be set aside.

Appeal from the Superior Court of Cook county; the Hon. JOSEPH SABATH, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1917. Reversed with finding of fact. Opinion filed October 16, 1918. Rehearing denied November 19, 1918.

JOHN E. KEHOE and CHARLES LE ROY BROWN, for appellant; JOHN R. GUILLIAMS, of counsel.

JOHN A. BLOOMINGSTON, for appellee.

MR. JUSTICE TAYLOR delivered the opinion of the court.

The plaintiff having obtained in a personal injury suit a judgment for $17,000, the defendant by this appeal seeks a reversal. The plaintiff, a teamster, drove a horse and wagon south on Halsted street and at the Congress street intersection turned east and while crossing the northbound track was struck by a car coming from the south.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

The plaintiff, who was 40 years old, had been a teamster since 1900, and was employed by the Leverentz Teaming Company, whose barn was south and east of the place where the accident occurred. The wagon was drawn by a dark bay, a good-sized, able, young, obedient horse. The vehicle was a light, single, uncovered, box wagon, about 10 feet long, the sides being from 16 to 18 inches high. The plaintiff about 2 p. m., on September 20, 1913, took a load of kindling to 2121 Armitage avenue and about 5 p. m. started back with the horse and empty wagon. He drove south on Curtis street to Madison street, on Madison to Aberdeen, south on Aberdeen to West Congress, then into Halsted street. At that time, nearly half-past 6 p. m., it was misting. It was still daylight and he had no light on his wagon. He drove south on Halsted street with (as he says) one wheel in the southbound street car track and the other to the west of the tracks. Having driven south on Halsted street, his horse going at a walk—one witness says it was a trot—about 200 feet, he turned east at about the point of central intersection. Congress street does not run through to the west at that point, but does at a point 100 to 200 feet to the north. When he arrived opposite the center of Congress he turned east to drive across the tracks. The horse or wagon, or both, were then struck by a street car coming from the south and the plaintiff was thrown out and severely injured.

It is the theory of the plaintiff that when he started, with his horse at a walk, to turn east from Halsted street into Congress street there was a street car coming on at a high rate of speed; that at the time when his horse had just gotten over the east track, the street car struck the side of his wagon and knocked him off; that from the distance the street car was away when he first saw it (he says 125 feet) he had a right to assume that he could cross in safety; that the defendant ran its car negligently and that he, him-

self, was not guilty of contributory negligence. It is the theory of the defendant; (1) that the conduct of the plaintiff, as testified to by himself, was, as a matter of law, negligence *per se;* (2) that the horse suddenly swerved—owing to the negligence of the plaintiff —and was struck by the car and that the verdict is, therefore, clearly against the weight of the evidence.

The undisputed evidence shows that the plaintiff drove a horse and empty wagon south on the west side of Halsted street for a distance somewhere between 100 and 200 feet to the intersection of east Congress street. Just what part of Halsted street it traveled on is in dispute. The plaintiff claimed that the east wheels of the wagon were tracking in the west rail of the southbound tracks and the defendant's witnesses claimed that all the wheels of the wagon were tracking. It is also practically undisputed that when the horse was at a point about opposite the middle of Congress street and was walking, it turned eastward to go across the east or northbound track and that the horse or wagon, or both, were struck by a street car which was going north. Also, that at the time the plaintiff was turning to the east, he saw the car coming from the south, and that there was no obstruction between him and the car.

The evidence, however, is conflicting as to (1) the distance the car was away, i. e., south, when the horse started to turn eastward; (2) the exact position or place of the horse in the street in regard to the east tracks, when the collision took place; (3) the speed of the car from the time the plaintiff first saw it until it struck the horse or wagon; (4) the position of the driver at the time of and just prior to the collision; (5) the distance the car ran after the collision; (6) the position of the plaintiff and the horse and wagon just after the accident.

1. As to the distance the car was away: The evidence of the plaintiff is that his horse was just turn-

ing into the southbound track when he first saw the car and that the car was then about 125 feet away. On direct examination he said, probably a little more than 125 feet; and on cross-examination he put it twice as 125 feet without qualification.    The evidence of the plaintiff's witness Sal Giunta, a teamster, who testified he stood at the time at the southeast corner of Congress and Halsted streets, is somewhat difficult to interpret.  On direct examination he said that the car, at the time the wagon started to turn east, was 75 feet away from the corner, evidently meaning, to the south; in one answer, that the car was only from 50 to 75 feet away, and in another, that it was 50 or 75 feet south, in front of a drug store, which latter he had already fixed as the sixth building south of the southeast corner of Congress and Halsted streets. In a written statement, dated October 16, 1913, and which was signed by him, were the words: "A northbound Halsted street car was about 20 feet south of this wagon as it pulled onto the track  *  *  *.  He tried to stop his car but the distance was too short," etc.

The evidence of the plaintiff's witness Nick Onesto, a foreman for Great Lakes, who saw the accident from the northeast corner of Congress and Halsted streets, is, on direct examination, that the first time he saw the wagon it was headed east; that he saw the car from about 50 feet south of the crossing to the time of the accident.  On cross-examination he said he saw the car when it was about 50 feet south of the south side of the street.  His testimony as to the exact place of the horse and wagon, when he saw the car 50 feet south of the street corner, is somewhat unintelligible; although, as he stated that when he first saw the wagon it was on the southbound track "headed east" and when he first noticed the car it was 50 feet south of the street corner, it may be reasonably inferred that at the time the plaintiff was turning

the horse to the east the car, in his opinion, was 50 feet south of the corner.

The evidence of Neuroth, a police officer, who, at the time in question, was standing back and a little to the right of the motorman, in the front end of the northbound street car, is that he was looking out of the glass in the right-hand door at some people at the street corner and turned around just in time to catch a glimpse of the shadow of the wagon at the time it was struck, that he had not seen the wagon before.

The defendant called four witnesses, Anthony Capouch, who was employed by the Commonwealth Edison Company; Alex Knaus, a brewer; Boris Rightman, in the grocery and cigar business; and Edward Regan, the motorman, of 12 years' experience; all of whom were on the front platform of the car at the time of the accident, and all of whom testified that the horse, when from 5 to 10 feet from the car, swerved or turned towards the east, and with its head struck and broke the window on the northwest side—though Capouch says it was the middle window—of the front vestibule of the car. Capouch stated that when the motorman saw the horse swerve he shouted "Jesus Christ" and started putting on the brakes.

2. As to the exact position of the horse in the street when the collision took place: As seen above, the evidence of the four witnesses for the defendant is that the horse suddenly turned east and was struck about the head. On the other hand, the plaintiff's and Giunta's evidence is that the horse was clear of the northbound track and that the car struck the wagon. Giunta in his signed statement, however, said that as the wagon pulled onto the track the car was only about 20 feet south. Onesto testified that the wagon was struck and that the horse was clear of the track. Neuroth, who says he turned only just in time to catch a glimpse of the shadow of a wagon, testified that the wagon was hit by the car and knocked to one side.

3. As to the speed of the car from the time the plaintiff says he first saw it 125 feet away: The plaintiff used the expression "coming so fast," that it came right along, "terrific speed." Giunta, "that it was going fast, going pretty fast; that he did not know if it changed its speed." In his written statement he fixed the speed at 15 miles an hour. Onesto said it was going pretty fast and did not slacken its speed. Neuroth testified it was going fast, at a good rate of speed and that the speed was not changed. Griffin, a witness and investigator for the defendant, stated, however, that in a talk with Neuroth the latter said the car was going only at 6 miles an hour and that the motorman rang his gong. For the defendant, Capouch put the speed of the car at 7 to 8 miles an hour; Knaus at 5 or 6 miles an hour; Rightman 5 or 6 miles, and Regan, the motorman, at 6. miles an hour.

4. As to the position of the driver at and just prior to the time of the collision: The plaintiff stated that, at the time he was sitting upon the wagon seat, when the car was almost upon him—just about to strike him—he dropped the lines on the horse's back, meaning that he used the lines as a whip to make the horse go faster; that that was the first time he had dropped the lines; that up to that time he had allowed the horse to go on in his regular walk. Giunta's testimony is silent on that subject. Onesto's evidence is that he did not see the plaintiff do anything, except sitting on the seat; that he did not know whether he was hurrying the horse up. Neuroth said nothing on the subject. Capouch said he did not observe the driver. Knaus did not testify on that subject. Rightman's evidence is that the driver was inside the wagon and was not on the seat and that he did not see whether the plaintiff had hold of the lines. Regan's, that the plaintiff was standing in the wagon back of the seat and did not have hold of the lines;

that he was folding a wagon or blanket cover and laying it on the seat in front of him; that the lines were hanging down on the left-hand side, fastened to something on the side of the seat.

5. As to the distance the car ran after the collision: Giunta says, 2 car lengths; Onesto, 20 feet; Neuroth, 100 feet; Capouch, 25 to 30 feet; Knaus, that the rear of the car was 10 to 20 feet north of Congress street; Rightman, that it stopped right away, that it went 6 or 8 feet; Regan, the motorman, 25 to 30 feet.

6. As to the position of the plaintiff, and that of the horse and wagon just after the collision: Giunta said that the wagon was knocked clear around, up against the curb on the west side of the street and that the plaintiff was picked up alongside of the car in between the tracks near the front wheels; that the horse got away and ran north. Onesto, that the wagon tipped over on the east side of Halsted street and was then at the northeast corner; that the plaintiff fell off the wagon on the east side of the car and was picked up when lying alongside the east side of the car. Neuroth, that the wagon after being struck was west of the car; that the plaintiff was lying near the front wheels west of the car. Capouch, that after the car stopped, the plaintiff was lying between the north and south tracks, his head at about the north wheels of the south track; that the wagon was on the west side of the car and was facing north. Knaus did not get off the car, and did not testify on that subject. Rightman, that the street car hit the horse and the horse turned the wagon around on the tracks. Regan, that the wagon after the collision was between the tracks and the west side of the car and headed north; that the car struck the horse's head and the horse swung the wagon around and the plaintiff fell headlong out of the wagon; that after the collision the wagon was between the car and the tracks, headed north. Practically all agreed that the horse broke loose and ran north.

From the foregoing analysis of the evidence two questions arise: (1) Was the plaintiff guilty of negligence *per se,* that is, as a matter of law? (2) Is the verdict clearly against the weight of the evidence? We shall proceed to consider both questions together:

When two men are driving on lines that visibly intersect, the general obligation of ordinary care becomes for each a definite duty, and if, as they approach, their contiguity and mutual movements suggest a probable or even a possible collision, neither is entitled to act on the assumption that the other will give way. *Cronch v. Peoria, L. & S. Traction Co.,* 181 Ill. App. 74; *Schlauder v. Chicago & S. Traction Co.,* 253 Ill. 154; *Netterfield v. New York City R. Co.,* 129 N. Y. App. Div. 56, 113 N. Y. Supp. 434; *McEniry v. Tri-City Ry. Co.,* 179 Ill. App. 152; *Lee v. Chicago City Ry. Co.,* 127 Ill. App. 510.

None of the witnesses for the plaintiff, including the latter himself, places the car at the time the horse started to turn further away than 125 feet. Giunta and Onesto place it at less than 125 feet, and Neuroth practically corroborates the testimony of the defendant's witnesses. Evidently the plaintiff knew at the time he turned, according to his own testimony, that the car was not only no more than 125 feet away, but that it was traveling at a terrific rate of speed. Giunta, Onesto and Neuroth all stated that it was going fast. At the time the plaintiff started to turn, he claims that the east wheels of the wagon were in the west rail of the west track so that it became necessary for him to drive east—including the arc of turning and in order to have the rear end of his wagon clear of the east track so far as to avoid a collision— at least 30 feet. The testimony of the plaintiff and Onesto, who were the only witnesses for the plaintiff who testified on that subject, is that the plaintiff at the time was seated on the wagon seat. The plaintiff further stated that when the car was about to strike

him he dropped the lines on the horse's back, meaning by that that he used the lines as a whip to make the horse, which was then walking, go faster, and up to that time he had allowed the horse to go at a walk and done nothing to accelerate his speed. After the collision, it is practically undisputed, the wagon was headed north and was west of the street car. That is contradicted by Onesto but, nevertheless, is sufficiently proven without his testimony. The plaintiff immediately after the collision was found lying west of the northbound car in between the north and southbound tracks, either near the front or the rear wheels of the car. Giunta and Neuroth say near the front wheels while Capouch says near the real wheels. The position of the wagon and the body of the plaintiff immediately after the collision is entirely consistent with the theory of the defendant that the street car struck the horse and not the wagon. The testimony of the plaintiff, supported only by the vacillating evidence of Giunta and the testimony of Onesto, is certainly very feeble when compared with the overwhelming testimony of Capouch, Knaus, Rightman and Regan, who at the time were standing in the front vestibule of the car. The evidence of the latter witnesses, considered together with the practically admitted position of the wagon and the body of the plaintiff after the collision, seems, in probative force, completely to overcome the effect of the evidence for the plaintiff.

It is a nice question whether or not the plaintiff was guilty of negligence as a matter of law, undertaking as he did, under the circumstances, to cross the street in front of the oncoming car. It does not seem reasonable to conclude that an average prudent man under the circumstances would have undertaken to drive across. Of course, the motorman and the plaintiff both may have been careless, but that of the former does not condone that of the latter.

*McEniry v. Tri-City Ry. Co., supra.* When the plaintiff saw the street car only 125 feet away and coming at a terrific speed and he knew, as he must have known, that he had at least 30 feet to go to get safely across, he was not justified in assuming that the motorman would be able to stop in time and would stop in time to allow him to cross safely. Considering the distance he had to go and that his horse was only walking and that he did nothing to accelerate its speed until the car—moving in his judgment at a terrific speed—was almost upon him, his conduct was at least rash and negligent. He may have thought that he very likely would get safely across and that to do so it might be necessary for the motorman to exercise quick judgment and slacken his speed or stop, and that the motorman would do so rather than endanger a collision, but in so thinking, and acting in pursuance of such conclusions, he was careless and not in the exercise of ordinary care. Ordinary caution does not mean unreasonable hesitation or reticence, but it does involve, at least, conduct which refrains from taking voluntarily and unnecessarily a dangerous course fraught with obvious and probable danger. However, we do not rest our decision on negligence *per se,* or as a matter of law. The evidence of Capouch, Knaus, Rightman and Regan, all of whom were on the front platform of the car at the time and all of whom testified that the horse when from 5 to 10 feet from the car swerved or turned towards the east, and that its head coming in collision with the car broke a window in the vestibule, is so consistent with the subsequent physical situation, and of such probative force, that we are impelled to the conclusion that the verdict of the jury was clearly against the weight of the evidence. The judgment is, therefore, reversed with a finding of fact.

*Reversed with a finding of fact.*

Finding of fact. We find as a matter of fact that the plaintiff was guilty of contributory negligence.